TYLER, Executrix *v.* SUBURBAN TRUST COMPANY, et al., Administrators

[No. 457, September Term, 1966.]

462

*Decided July 18, 1967.*

The cause was argued before HAMMOND, C. J., and HORNEY, MARBURY, OPPENHEIMER, BARNES, McWILLIAMS and FINAN, JJ.

*J. Roy Thompson, Jr.,* with whom was *Benton C. Tolley, Jr.,* on the brief, for appellant.

*William W. Beckett,* with whom were *James P. Salmon* and *Duckett, Orem, Christie & Beckett* on the brief, for appellees.

FINAN, J., delivered the opinion of the Court.

Appellant (defendant below), Mattie Richards Tyler, is executrix of the estate of Mary Lillian Williamson, who died, unmarried, at the age of 86 years, a resident of Montgomery County, Maryland, on June 24, 1965. Appellees (plaintiffs be-

low) are the administrators, c.t.a. of the estate of Margaret S. Zimmele, who died a widow, at the age of 91 years, a resident of Montgomery County, Maryland, on January 23, 1964.

This case involves a dispute over the ownership of funds remaining in a joint savings account, with right of survivorship. Upon the death of Mrs. Zimmele, Miss Williamson, whose name together with Mrs. Zimmele's appeared on the account, withdrew, as the survivor, the balance in the account. The administrators of the Zimmele estate sued Miss Williamson to recover these funds.

Mrs. Zimmele and Miss Williamson lived together continuously, first in Washington, D. C. and then in Montgomery County, Maryland, at the home owned by Mrs. Zimmele from January 3, 1935, until the death of Mrs. Zimmele.

On June 1, 1934, Mrs. Zimmele opened savings account #21166 at the main office of the American Security and Trust Company in Washington, D. C., in her sole name, with a deposit of $10,000. This account, after various deposits and withdrawals by Mrs. Zimmele, had a balance of $195.82 on February 20, 1956. A few days before Mrs. Zimmele, alone, went to the American Security and Trust Company and requested information as to how to add another name to the savings account and wanted to know what effect this would have on the funds. The bank employee of whom this inquiry was made was Mrs. Helen McCallum who was in charge of opening new accounts. Mrs. McCallum, at the trial of this matter, testified that she informed Mrs. Zimmele that when an account was made into a joint account either party could withdraw funds at any time or close the account without the signature of the other and that in the event of the death of one party the funds were available to the survivor. She further testified that Mrs. Zimmele replied that that was exactly the way she would like the account taken care of and requested instructions as how to accomplish this. Upon being told that signature cards had to be executed and witnessed by a disinterested party, Mrs. Zimmele stated she would return to the bank with Miss Williamson to execute the cards.

On February 20, 1956, Mrs. Zimmele came back to the same employee in the company of Miss Williamson and executed the signature cards and they were witnessed by the bank employee.

At the same time both ladies executed an "Agreement" whereby, among other things, they agreed to the following:

"We, the undersigned depositors, * * * agree that this account is subject to all laws and regulations of * * * the District of Columbia now or hereafter in force.

"The undersigned depositors, hereby further agree each with the other and with the American Security and Trust Company that all sums now on deposit or hereafter deposited by either or both of said depositors with said bank to their credit in this account with all accumulations thereon are and shall be owned by them jointly and severally with the right of survivorship and shall be subject to the check or receipt of either of them or the survivor, and payment to or on the check of either or the survivor shall be valid and discharge said bank from liability.

* * *

"Payment to or on check of the survivor shall be subject to the laws relating to inheritance and succession taxes and all rules and regulations made pursuant thereto."

The passbook was endorsed by stamp as follows:

"Payable to both or either or the survivor each granting to the other the irrevocable power to draw on our joint or several names."

The names on the passbook were changed so that they appeared:

"In account with Margaret S. Zimmele or Miss Mary Williamson or survivor."

The rules and regulations appearing in the savings account passbook to which the parties had agreed to be bound stated:

*"This book must be presented to the Company whenever a deposit is made or money withdrawn, * * *.* Possession of the book of deposit shall be sufficient

evidence of ownership thereof to authorize the payment of money due thereon."

On that same day and as a part of the transaction, $3,000 was transferred from Mrs. Zimmele's checking account at the same bank to the joint and survivor account, making the balance in the joint account $3,195.82 on February 2, 1956.

When these transactions were complete the bank's employee handed Mrs. Zimmele the passbook and told her that the account was now a joint account with right of survivorship and Mrs. Zimmele again stated that that was exactly the way she wanted these funds handled.

There were subsequent deposits and withdrawals in the joint account and on August 23, 1963, there was a balance of $16,-715.12. On that day Mrs. Zimmele received the total sum of $40,477.54, the net proceeds of the sale of the Great Barrington property, located in Massachusetts. Miss Williamson deposited this sum in the joint and survivor account in question.

On October 10, 1963, Mrs. Zimmele withdrew the sum of $20,000 from this account and invested this sum in mortgage notes in her sole name. This was the only withdrawal from this account after the deposit of $40,477.54 on August 23, 1963. All of the money placed in the account came from funds supplied by Mrs. Zimmele.

Miss Williamson had possession of the passbook at various times, as she did banking for the two of them. There was no evidence of any actual delivery of the passbook to Miss Williamson for her permanent possession. The passbook was usually kept in a desk in Mrs. Zimmele's bedroom, however, there is no evidence as to where the passbook was found after Mrs. Zimmele's death.

There was testimony by Mrs. Angela Baunach, a nurse for some months in the Zimmele household during 1963, that she had heard Mrs. Zimmele state that she wanted Miss Williamson to have the money in the joint account. A servant in the household, Julia Bell, testified that Mrs. Zimmele had stated, in the presence of Miss Williamson and herself, that she wanted Miss Williamson to be on the joint bank account "in case anything happens to me and I can't get to the bank, Miss William-

son is going to have money she can draw on, money to work with." There was also testimony from Mrs. Baunach to the effect that Mrs. Zimmele had expressed her anxiety that Miss Williamson would not have enough money with which to live and that she wanted her to have the money in the joint bank account and that Mrs. Zimmele had stated regarding her relatives, the Scullys, "Oh, there's enough money for them."

On August 26, 1963, Mrs. Zimmele, in the presence of Mrs. Baunach, wrote the name "Mary Lillian Williamson" and date "August 26, 1963" on the jacket of the passbook and stated to Mrs. Baunach, "This is for Miss Williamson."

During their lifetime together, from 1935 to Mrs. Zimmele's death in 1964, Miss Williamson was her constant companion. She handled all finances, ran the household and for a short period ran, together with Mrs. Zimmele, a house for paying guests on the Great Barrington property owned by Mrs. Zimmele in the Berkshires in Massachusetts. They were devoted friends and shared a great interest in the Daughters of the American Revolution. They were both patriotic old ladies; militantly anti-communistic, who insisted that the American flag be displayed outside their home everyday. Unfortunately, they were part of a vanishing era.

Miss Williamson never accepted any salary for her services, but Mrs. Zimmele from time to time made gifts of stocks and bonds to Miss Williamson.

At the death of Mrs. Zimmele on January 23, 1964, the balance in the account was $37,528.79. The Zimmele family had previous knowledge of the joint account. The administrators of the estate filed, February 25, 1964, an information report with the Orphan's Court of Montgomery County, Maryland, where the Zimmele estate was being administered, in which they listed the joint account in question with a balance of $37,528.79, and indicated that Miss Williamson was the joint owner. Miss Williamson was billed for and paid the Maryland inheritance tax in the amount of $1,407.33. The inventory and appraisal filed on May 1, 1964, by the Zimmele administrators, showed the appraised value of the stocks in the estate as $1,040,845.68.

There was testimony by an official of the Suburban Trust Company to the effect that after Mrs. Zimmele's death, he ques-

tioned Miss Williamson about the joint bank account and she stated that $17,000 of the $37,000 balance in the joint account was to be hers and $20,000, representing part of the proceeds of the sale of the Great Barrington property, belonged in the Zimmele estate. However, Mrs. Baunach, the nurse, testified that after Mrs. Zimmele's death, she overheard a conversation between Miss Williamson and Mr. Thomas Scully, one of the administrators of Mrs. Zimmele's estate, concerning the disposition of the joint bank account and that Miss Williamson had claimed that it all belonged to her because Mrs. Zimmele wanted her to have it. Unfortunately, Miss Williamson died before the trial of this matter leaving many questions unanswered.

Mrs. Zimmele in her will devised the home in Kenwood, Montgomery County, wherein she and Miss Williamson had lived together for 29 years, to Miss Williamson. The property was appraised for estate purposes at $60,000.

On April 2, 1964, Miss Williamson withdrew the entire balance in the joint bank account and the same was closed.

On May 18, 1964, one of the administrators wrote a co-administrator expressing the opinion that the sum of $20,477.54 of the joint account belonged to the estate. This sum was the balance from the sale of part of Mrs. Zimmele's Great Barrington property of $40,477.54 deposited on August 23, 1963 less the sum of $20,000 withdrawn on October 10, 1963, and invested in mortgage notes in Mrs. Zimmele's sole name. The administrators made demand upon Miss Williamson for the sum of $20,477.54 out of this account and upon her refusal this action at law was instituted to recover the entire balance of $37,-528.79. Upon the death of Miss Williamson on June 24, 1965, her executrix was substituted as defendant.

Trial before Judge Pugh, without a jury, in the Circuit Court for Montgomery County, was held on June 21 and 22, 1966, and on August 22, 1966, the Judge's "Opinion, Decision and Judgment" was entered. The judgment was in favor of appellees in the amount of $43,345.63 (being principal in the amount of $37,528.79 and interest of $5,816.84 and costs). From that judgment this appeal was taken.

In rendering its judgment in this case, the lower court applied the law of the State of Maryland governing the right of

survivorship with regard to this joint bank account. However, the opinion of the lower court is not clear as to whether it applied the Maryland law because it thought that the law of the forum should control rather than the law of the place of deposit (District of Columbia) or whether it applied the law of the State of Maryland because it thought, as was artfully argued by the appellee, that the law of the District of Columbia was essentially the same as the law of the State of Maryland on this point and that accordingly, the law of the forum and the law of the place of deposit were the same.

Regardless of what may have been the rationale behind the lower court's reasoning, we must at the outset of this opinion establish the premise that the law of the District of Columbia regarding the right of survivorship in this joint bank account must apply and we do not think that is the same as the law of the State of Maryland governing the right of survivorship in joint and survivorship bank accounts.

We say that the law of the place of deposit should control, not only because of an abundance of case law supporting the proposition, *Imirie v. Imirie,* 246 F. 2d 652 (D. C. Cir. 1957); *Seng v. Corns,* 58 So. 2d 686 (Fla. 1952); *Barstow v. Tetlow,* 97 A. 829 (Me. 1916); *In Re Damato,* 206 A. 2d 171 (N. J. Super. Ct., App. Div. 1965); *Wyatt v. Fulrath,* 239 N. Y. S. 2d 486 (Sup. Ct. 1963); see Annot., 25 A.L.R. 2d 1240 (1952) and 10 Am. Jur. 2d *Banks* § 376 (1963); but also because of the express agreement between the parties to the deposit who both signed the form of the deposit agreement provided by the bank, which stipulates that:

> "We, the undersigned depositors, * * * agree that this account is subject to all laws and regulations of * * * the District of Columbia now or hereafter in force."

The appellees in their brief raised the issue that the appellant, as the defendant below, did not directly or indirectly request the trial judge to apply the law of the District of Columbia to the facts of this case; and that pursuant to Maryland Rule 885, unless it is clear from the record that a question was raised below, the question (such as the conflict of laws in this

instance) is not properly before this Court on appeal. Counsel for appellant in his reply brief stated that counsel for both parties in this case argued the applicability of the Maryland and the District of Columbia law in the lower court, but that the argument of counsel, although transcribed by the reporter, was not included in the record. We do not believe that there is any merit to the contention that the conflict of laws question was not properly before the *nisi prius* court. Appellees' counsel conceded that they were notified prior to trial that the appellant might rely upon the law of the District of Columbia and this Court is satisfied that the legal import of the law of the District of Columbia with respect to joint and survivorship bank accounts was argued before the lower court.

Since this Court is of the opinion that the substantive law of the District of Columbia governs the right of ownership of this joint bank account, it is incumbent upon the Court to state what we believe that law to be with an awareness that any attempt to interpret the law of another jurisdiction is frequently viewed by our brothers as an exercise in temerity.

The lower court, applying the substantive law of Maryland to the instant case, failed to find in the language used to create the joint and survivorship account the magical words of art "in trust," or other words or acts showing the intent on the part of the donor to establish a trust. It has been the traditional pursuit of Maryland courts in such cases to seek to find whether there was an intent to create a trust, since the importance of such an intent was emphasized by Chief Judge McSherry in his classic opinion in the second *Milholland* case, (*Milholland v. Whalen,* 89 Md. 212, 216, 43 A. 43, 44, L.R.A. 205, 207 (1899)). This opinion has been followed by an imposing array of cases, a compendium of which is to be found in this Court's opinion by Judge Hammond (now Chief Judge) in *Bierau v. Bohemian Bldg. Etc. Assn.,* 205 Md. 456, 109 A. 2d 120 (1954).

In the absence of a trust, the only other alternative for the lower court to pursue was to orient its consideration to the question of the requisites for a valid gift *inter vivos* of the joint savings bank account. It found that there was no gift of the bank account from Mrs. Zimmele to Miss Williamson because

there had been no surrendering of permanent possession of the passbook (no *"in praesenti"* donation) on the part of Mrs. Zimmele and thus the *"locus poenitentiae"* remained in the donor; see *Nicholas v. Owrutsky,* 230 Md. 60, 185 A. 2d 498 (1962) ; *Brooks v. Mitchell,* 163 Md. 1, 161 A. 261 (1932) ; *Milholland v. Whalen, supra;* Katzenstein, "Joint Savings Bank Accounts in Maryland," 3 Md. L. Rev. 109 (1939).

However, in applying the law of the District of Columbia, as we construe it to be, we believe that the core of the matter with regard to joint accounts with right of survivorship is whether sufficient evidence exists to prove the intent on the part of the donor of the joint bank account to establish survivorship to the account in the donee. *Horowitz v. Fainberg,* 374 F. 2d 336 (D. C. Cir. 1967) ; *Donoughe v. Morgan,* 298 F. 2d 329 (D. C. Cir. 1962) ; *Imirie v. Imirie, supra; Matthew v. Moncrief,* 135 F. 2d 645 (D. C. Cir. 1943).

If the intention of the donor of the joint account to create the right of survivorship is clear, it is our belief that the courts of the District of Columbia will effect the implementation of such an intent, unless by so doing a violation of public policy results.

In *Matthew v. Moncrief, supra,* Judge (later Justice) Vinson writing for the Court said at p. 649 :

> "The complaint shows that a contract was signed by both donor and donee with the Perpetual Building Association; that the words of the contract expressed a clear and unequivocal intention in the donor to make the donee a joint owner; and that a clause of survivorship was included in the instrument. The complaint does not allege fraud or mistake in the execution of the joint agreement. We cannot, under these circumstances, allow Mrs. Davidson's clearly written and plainly expressed purpose to be rewritten after her demise, or deprive the appellee of rights in a contract to which she was a party-signatory. Accordingly, we hold that the District Court rightly considered that the appellants' complaint did not state a cause of action."

This Court realizes that the holding of *Matthew v. Moncrief, supra,* has been weakened by *Murray v. Gadsden,* 197 F. 2d 194 (D. C. Cir. 1952) wherein that court stated at p. 202 :

"when it is alleged a written instrument does not express the actual intention of its signers, the court may receive parol evidence as to what their real purpose was; and that, should a variance be found between the true agreement and its written expression, the court may reform the writing to cause it to express the actual intention of the parties. This exception to the parol evidence rule apparently was overlooked by this court in its consideration of Matthew v. Moncrief. We think the exception should have been recognized and applied in that case."

In *Harrington v. Emmerman,* 186 F. 2d 757 (D. C. Cir. 1950), a case which arose before the death of either of the joint depositors, *Matthew v. Moncrief, supra,* was distinguished at p. 760 on the ground that the court in *Matthew* failed to reach the issue of whether by changing an individual account into a joint and survivorship account "the original depositor transfers the account, or an interest in it, in *praesenti* to the person who he designates as joint owner."

Thus it is clear that *Murray* and *Harrington* hold that for right of survivorship to become operative in a joint and survivorship account, the donor must have an intent in *praesenti* and the other requisites for a gift *inter vivos* must be satisfied.

However, in reading *Murray* one cannot help but feel that the Court was influenced by the evidence, which even the donee conceded to be true, that the donee's name (she was the sister of the donor) was added to the account because of the understanding the donor had with the donee, that upon the donor's death the donee would see that the funds from the account were distributed among herself and two other sisters. The case is pregnant with the idea that the joint and survivorship account was also a device intended to circumvent the statutory share to which the husband would have been entitled in the funds. The Court recognized the testamentary character of the account when it stated in its opinion at p. 206:

"if she did in fact have such a testamentary intention, she unfortunately chose a means of expressing her desire which the law does not recognize as a valid will."

It is also significant that *Murray* and *Harrington* were followed by *Imirie v. Imirie, supra,* a case wherein several joint and survivorship checking accounts, established by the husband as donor, were used almost exclusively for the payment of the commercial accounts in the operation of his office, and the accounts were ultimately used as a device to circumvent the claims of creditors of the husband after his death. The Court found against the wife, who claimed the funds remaining in the accounts as survivor, and in favor of the husband's executor. However, the Court, discussing the law applicable to the case in its opinion, referred to *Murray* and *Harrington* at p. 653 in the following terms:

> "Perhaps, however, we should here add that we do not read those cases as holding that any right of survivorship in a joint account is automatically defeated if the donating party retains a power to withdraw during his lifetime. Nor do we read them as holding that any document purporting to create a right of survivorship in a joint account is necessarily testamentary in character. On the contrary, *we think that if the intent of the donor of the joint account to create a right of survivorship is clear, and no principle of public policy is violated by recognizing the right in the particular case, the right should be recognized."* (Emphasis supplied.)

It is true that the treatment given to *Murray* and *Harrington* by the Court in *Imirie* was by way of a footnote, but in the subsequent cases of *Horowitz v. Fainberg, supra,* and *Donoughe v. Morgan, supra,* there was no effort made to correct the impression that the intent to create the survivorship is the important factor in such cases, and indeed if anything, we must assume that *Horowitz* and *Donoughe* hold that where the facts show that the joint and survivorship account expressly provides for survivorship, that this intent will prevail unless evidence to the contrary is produced. In *Horowitz, supra,* a father and son, who were partners in a junk business, maintained a joint account with right of survivorship to which each contributed equally. The executor of the father's estate sought to deny the

son's claim as survivor to the father's share of the account. In its per curiam opinion the Court said at p. 336:

"* * * No complaint is made here of the latitude afforded appellants by the court, sitting without a jury, to prove that decedent did not intend the survivorship consequences which normally attend upon this kind of ownership. It is said that the court could not properly have found, as it did, that decedent 'knew, understood, and acquiesced in the fact that the accounts and stocks were held jointly with right of survivorship.'

"* * * There was some evidence looking away from a survivorship intention, * * *. But there was * * * evidence that decedent fully understood the nature and consequences of joint tenancy."

Counsel for the appellee in a skillful presentation of their case pointed out that *Horowitz* and *Donoughe* represent cases wherein both parties, whose names appeared on the account, contributed to the funds in the account and that in such cases the principle that there is a consideration passing between the parties to the account sustains the right of survivorship and directs the Court's attention to 10 Am. Jur. 2d *Banks* § 369 (1963); Annot., 149 A.L.R. 879, 880-81 (1944) and Annot., 135 A.L.R. 993 (1941). Assuming this to be a valid statement of the law, *arguendo* there is evidence in the instant case that Miss Williamson worked for twenty-nine years for Mrs. Zimmele without salary. True, she received her room and board and accompanied Mrs. Zimmele on many trips, but were these emoluments really compensation for what appears to have been services of a substantial nature? She managed Mrs. Zimmele's financial affairs, not an inconsiderable or inexacting responsibility, when we consider that Mrs. Zimmele's assets were over a million dollars. There was evidence given by relatives of Mrs. Zimmele that Miss Williamson received from Mrs. Zimmele stocks and bonds on occasion. However, there is no evidence whatsoever as to the amount or extent of these largesses. Therefore, how can one really conclude that the funds in the joint account did not represent any contributions emanating from Miss Williamson's efforts or were not in compensation for services rendered by her?

As counsel for the appellant pointed out, if, in the *Horowitz* case, the son had worked for the father without salary, and the father had made all of the deposits in the account, would the Court have had a valid basis for arriving at a different conclusion? We think not.

The legal effect of the right of survivorship had been fully explained to Mrs. Zimmele by Mrs. McCallum, the employee of the bank in charge of opening new accounts. Mrs. Zimmele acted upon this advice by signing the agreement which established the joint and survivorship account some nine years before her death. The statements made by Mrs. Zimmele to the nurse, Mrs. Baunach, and to the maid, Julia Bell, all are corroborative of her conviction that she had placed survivorship to the account in her devoted friend, Miss Williamson.

As was stated by the Court in *Imirie v. Imirie, supra,* at p. 653:

> "we think that if the intent of the donor of the joint account to create a right of survivorship is clear, and no principle of public policy is violated by recognizing the right in the particular case, the right should be recognized."

Certainly in the instant case there is no evidence of fraud or coercion; there is no evidence that the account was established to thwart the laws governing testamentary disposition or to circumvent creditors; there was no violation of public policy.

Therefore, it is the opinion of this Court that the lower court should be reversed and the case will be remanded for entry of judgment for the appellant.

> *Judgment reversed and case remanded for entry of judgment for appellant, appellees to pay the costs.*